## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TUTOR TIME® LEARNING CENTERS, LLC, | ) |
| Plaintiff, | ) |
| | ) Civil Action No.: 1:12-cv-04129 (NGG) (RER) |
| | ) |
| v. | ) |
| | ) |
| KOG INDUSTRIES, INC., GABRIEL | ) |
| COLMENARES, AND GABECO INDUSTRIES, | ) |
| INC. | ) Served on August 31, 2012 |
| Defendants. | ) |
| | ) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION SEEKING A PRELIMINARY INJUNCTION PURSUANT
## TO FEDERAL RULE OF CIVIL PROCEDURE 65

Stuart P. Slotnick, Esq.  (Bar No. SS - 1964)
Natalie N. Peled, Esq.    (Bar No. NP - 6845)
BUCHANAN INGERSOLL & ROONEY PC
1290 Avenue of the Americas, 30th Floor
New York, NY  10104-3001
Telephone: (212) 440-4400
Facsimile:  (212) 440-4401
Stuart.Slotnick@bipc.com
Natalie.Peled@bipc.com
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND ................................................................................2

ARGUMENT .........................................................................................................4

I.   Lanham Act And Other Violations                                              4

   A.   Preliminary Injunction Standard ....................................................... 4

   B.   Tutor Time®, Its Customers And The General Public Will Suffer
        Irreparable Harm If An Injunction Is Not Granted Enjoining the
        Staten Island Location Defendants and the Queens Location
        Defendants From Operating The Staten Island Location and
        Queens Location Childcare Centers Under the Tutor Time® Name.......... 5

   C.   Tutor Time® Is Likely To Succeed On The Merits Of Its Claims
        And The Equities Tip Decidedly in Tutor Time®'s Favor........................ 7

        1.   Tutor Time® Is Likely to Succeed on its Trademark Infringement
             Claims ..................................................................................... 7

             (a)   Plaintiff's Mark Is Incontestable and Entitled to
                   Protection ..................................................................7

             (b)   Defendant's Use of Plaintiff's Incontestable Marks
                   Is Likely to Cause Consumer Confusion .............................7

        2.   Tutor Time® Is Likely to Succeed on its Dilution Claims ............... 9

             (a)   Tutor Time®'s Marks Are Distinctive ................................9

             (b)   Defendant's Use Is Likely to Dilute Tutor Time®'s
                   Marks .........................................................................9

        3.   Tutor Time® Is Likely to Succeed On Its Trademark Infringement
             and Unfair Competition Under New York Common Law Claims .. 10

   D.   The Equities Favor Tutor Time® ............................................................ 10

II.  Violation Of Post-Term Competitive Restrictions                          11

   A.   Preliminary Injunction Standard ............................................................ 11

   B.   Tutor Time® Will Suffer Irreparable Injury If Defendants Are Not
        Enjoined And The Equities Favor Tutor Time® ..................................... 12

i

C.    Tutor Time® Is Likely to Succeed On The Merits Of Its Claim.............. 14

1.    The Post-Term Competitive Restrictions Are Reasonable With Respect To Duration ........................................................................ 15

2.    The Post-Term Competitive Restrictions Are Reasonable With Respect To Geographical Area ........................................................ 15

3.    The Post-Term Competitive Restrictions Are Reasonable With Respect To Line of Business........................................................... 16

CONCLUSION.............................................................................................................16

# TABLE OF AUTHORITIES

## Cases

*Allied Maintenance Corporation v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538 N.Y.S.2d 628 (1977)..................................................................................................... 9

*Basicomputer Corp. v. Scott,* 973 F.2d 507 (6th Cir.1992) ....................................... 12

*Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................. 8

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.* 511 F. 3d 535 (6th Cir. 2007) ............................................................................................................ 12, 14, 15

*Ecolab, Inc. v. K.P. Laundry Mach., Inc.,* 656 F. Supp. 894 (S.D.N.Y. 1987) ............. 5

*Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70 (2d Cir. 1970)...................................... 6

*In re DeLorean Motor Co.,* 755 F.2d 1223 (6th Cir. 1985).......................................... 12

*In re Spradlin,* 284 B.R. 830 (E.D. Mich. 2002) .................................................... 15, 16

*Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d 438 (2d Cir. 1977) .......................... 6

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,* 323 F. Supp. 2d 525 (S.D.N.Y. 2004) .... 5, 13

*Kraft General Foods, Inc., v. Allied Old English, Inc.*, 831 F. Supp. 123 (S.D.N.Y. 1993) .......... 9

*Lambda Elec. Corp. v. Lambda Tech., Inc.*, 515 F. Supp. 915 (S.D.N.Y. 1981) ........................ 11

*Mead Data Central, Inc., v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026 (2d. Cir. 1989) ................................................................................................................ 9

Nat'l Commc'n Ass'n, Inc. v. AT&T, 813 F. Supp. 259 (S.D.N.Y. 1993) ..................... 4

*New York Stock Exchange v. New York, New York Hotel, LLC*, 293 F.3d 550 (2d Cir. 2002) ................................................................................................................... 10

*Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492 (2d Cir. 1961)....................... 7, 9

*Singas Famous Pizza Brands Corp. v. New York Adver. LLC*, 11-1038-CV, 2012 WL 899231 (2d Cir. Mar. 19, 2012) ........................................................................ 11, 12

*SMJ Group, Inc. v. 417 Lafayette Rest. LLC*, 439 F. Supp.2d 281 (S.D.N.Y. July 6, 2006).......... 6

*Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63 (2d Cir. 1999)................................. 5, 11, 12

i

*Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969 (2d Cir. 1989) .................................. 5

*Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141 (2d Cir. 2003) ........................................... 4, 7, 10, 13

**Statutes**

15 U.S.C. § 1116(a) ..................................................................................................... 4

N.Y. Gen. Bus. Law § 360-l .......................................................................................... 9

**Rules**

Fed. R. Civ. P. 65......................................................................................................... 4

# PRELIMINARY STATEMENT[1]

Plaintiff, Tutor Time® Learning Centers, LLC, ("Tutor Time®" or "Plaintiff")
respectfully submits this Motion for a Preliminary Injunction because defendant Gabriel
Colmenares ("Colmenares"), defendant Gabeco Industries Inc. (together with Colmenares the
"Staten Island Location Defendants") and defendant KOG Industries, Inc. (together with
Colmenares the "Queens Location Defendants") have willfully, knowingly, and in bad faith
repeatedly infringed upon Tutor Time®'s rights in its valuable, famous, federally registered, and
incontestable trademarks.  And, notwithstanding the filing of the underlying lawsuit, the
defendants have continued to willfully infringe upon Plaintiff's Marks[2] and intellectual property.
The Staten Island Location Defendants were put on notice of their infringing activities on at least
four separate occasions. *See* Young Decl., at ¶ 21.  The Queens Location Defendants'
obligations to cease and desist usage of the Tutor Time® Marks and intellectual property is a key
component of the franchise agreement they executed and were again highlighted for them in the
termination letter they received as a result of their material breaches of the franchise agreements.
*See* Young Decl., at ¶ 11.  However, when put on notice of their infringing activities, defendants
refused to cease and desist, continued their infringing actions and continued to market, advertise,
promote and sell childcare services under the banner of the Tutor Time® Marks.

Unless and until the defendants' infringement is enjoined, Tutor Time® will be
irreparably harmed by, among other things, public confusion, dilution of Tutor Time®'s Marks
and reputation, loss of goodwill and the continued infringement upon its Marks and intellectual

---

[1]      All references made to the Declaration of Ira L. Young, dated August 31, 2012, shall be as follows: Young
Decl., at ¶ __.
[2]      Capitalized terms used in this Motion without definition shall have the meaning ascribed to them in the
Complaint and the Queens Location Agreements, as defined in the Complaint.

property.  As detailed below, Tutor Time® has demonstrated all of the requisite elements for injunctive relief, and its motion should be granted.

Additionally, the Queens Location Defendants should be enjoined from violating the post-term competitive restrictions in the Queens Location Agreements.  Injunctive relief is necessary to prevent the defendants from capitalizing on Tutor Time®'s good will, reputation and trade secrets by promoting a competing business after the defendants have ceased being franchisees.

## FACTUAL BACKGROUND

Plaintiff is a significant franchisor of childcare operations in the United States, and is widely known as a provider of child care and educational services.   For over two decades Plaintiff has developed a broad range of trademarks, service marks and logos which are on the principal register of the United States Patent and Trademark Office.  Tutor Time® has the exclusive right to use and to license these marks and their derivations thereof as well as the distinctive Tutor Time® curriculums, all of which are used by Tutor Time® and its franchisees to provide child care and education services to the public under the Tutor Time® name.  Tutor Time® or its predecessors have continuously used the Tutor Time® Marks since the date of their registration.  Those registrations are in full force and effect, unrevoked, uncancelled, and incontestable.

Through its franchise system, Tutor Time® markets, promotes and provides services to its childcare franchisees throughout the United States and has invested substantial effort and funds in developing its trade names and trademarks in order that consumers throughout the United States recognize the Tutor Time® Marks as distinctly designating Tutor Time® childcare and learning centers as originating with Tutor Time®.  The goodwill embodied in the Tutor

2

Time® Marks, and consequently Tutor Time®'s valuable reputation and credibility in the childcare industry, depends on the integrity of the Tutor Time® Marks as source identifiers of Tutor Time®, and not of any other source.

As more fully detailed in the Complaint and the Declaration of Ira L. Young which is contemporaneously filed with this Motion, both the Queens Location Defendants and the Staten Island Location Defendants operate childcare centers which have been impermissibly promoted and billed as belonging to the Tutor Time® franchise system.  The Staten Island Location Defendants and the Queens Location Defendants have been displaying the Tutor Time® name and Marks throughout the Staten Island and Queens Location Childcare Centers and in advertisements for the same.  Despite multiple demands from the Plaintiff to cease and desist, all the defendants blatantly continue their infringing activity.  *See* Cmplt. at ¶¶ 16-24, 40-44; Young Decl. at ¶¶ 17-23.

The Staten Island Location Defendants are not, and never have been, authorized to operate the Staten Island Location Childcare Center as a Tutor Time® affiliated center.  KOG Industries, Inc. was a valid franchisee of the Tutor Time® franchise system, but the applicable franchise agreement was duly terminated due to KOG Industries, Inc.'s material breaches and Colmenares' subsequent failure to meet the requirements of the Queens Location Guarantee.  In addition, the Queens Location Agreements include valid post-term competitive restrictions (Cmplt. at ¶ 45 and Ex. D) that, *intera alia,* require that the former franchisee not engage in a Competitive Business within a ten mile radius for a period of two years.  In blatant violation of these restrictions on competition, the Queens Location defendants currently do and plan to continue operating a childcare facility at the current Queens Location which will be in direct competition with at least two other Tutor Time® locations.  *See* Young Dec. at ¶¶ 31-32.

## ARGUMENT

I.   **Lanham Act And Other Violations**

A.   **Preliminary Injunction Standard**

The law is clear and well-settled in the Second Circuit, that a party is entitled to a preliminary injunction where it is able to demonstrate the probability that it will suffer irreparable harm if it is not granted the relief it requests, and is also able to show either: (i) a likelihood that it will succeed on the merits of its claim; or (ii) a serious question going to the merits of its claims to make them fair grounds for litigation and a balance of hardships tipping decidedly in its favor.  Fed. R. Civ. P. 65; *see also Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 145 (2d Cir. 2003) (granting injunctive relief where defendant's actions would result in a loss of customers and plaintiff's good will and reputation); *Nat'l Commc'n Ass'n, Inc. v. AT&T*, 813 F. Supp. 259, 264 (S.D.N.Y. 1993) (granting injunctive relief where plaintiff's customers would have no reason to switch telecommunications services if defendant's activities are enjoined).

In addition, Section 34 of the Lanham Act gives this Court the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office. . . . " 15 U.S.C. § 1116(a).  Under the Second Circuit's standard for the issuance of a temporary and preliminary injunction, it should issue when the plaintiff has demonstrated (i) the probability of irreparable harm in the absence of injunctive relief, and (ii) either a likelihood that it will succeed on the merits of its claim, or a serious question going to the merits and a balance of hardships tipping decidedly in its favor.  *Nat'l Commc'n Ass'n, Inc.* 813 F. Supp 259, 264 (granting injunctive relief); *accord Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 145 (2d Cir. 2003) (granting preliminary injunction).

4

In an action for trademark infringement, however, when a mark merits protection and the plaintiff has made a showing that consumers are likely to be confused by the infringing mark, irreparable harm is presumed. *Id.* at 146.  As explained below, and as supported by Plaintiff's Complaint, the Motion for Preliminary Injunction, and all declarations and exhibits submitted therewith, Plaintiff easily meets this standard and a preliminary injunction should issue.

**B.**     **Tutor Time®, Its Customers And The General Public Will Suffer Irreparable Harm If An Injunction Is Not Granted Enjoining the Staten Island Location Defendants and the Queens Location Defendants From Operating The Staten Island Location and Queens Location Childcare Centers Under the Tutor Time® Name**

In order to establish that it will suffer irreparable harm if the offending conduct is not enjoined, a movant must show that the claimed injury is "actual and imminent" (as opposed to remote or speculative in nature) and that it cannot be compensated by a monetary award. *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989).  To this end, Courts have repeatedly found that a loss of customer good will constitutes irreparable harm to a party which cannot be adequately compensated by monetary damages. *See Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69 (2d Cir. 1999) (it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business"); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 531 (S.D.N.Y. 2004) (granting injunctive relief where loss of business generated by clients, and the plaintiff's loss of good will as a result thereof, could not be monetarily valued); *Ecolab, Inc. v. K.P. Laundry Mach., Inc.*, 656 F. Supp. 894, 899 (S.D.N.Y. 1987) (loss of good will constitutes irreparable harm that cannot be compensated by money damages).

Here, the facts show that Tutor Time® and its customer base will suffer actual and imminent harm if the defendants are permitted to continue operating childcare centers that

impermissibly utilize the Tutor Time® Marks and intellectual property. *See* Young Decl., at ¶¶ 18, 24-28. By their nature, childcare centers that are not parties to franchise agreements with Tutor Time® are not regulated or controlled by Tutor Time® and therefore the care provided by the Staten Island Location and Queens Location Childcare Centers is likely to be subpar and could pose hazards to the children who attend these childcare location. Since the Staten Island and Queens Location Centers are being impermissibly billed as Tutor Time® Childcare Centers this could severely impair Tutor Time®'s good will and reputation among its clientele and the public at large. *See e.g., Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d 438, 445 (2d Cir. 1977) (affirming finding of irreparable harm because plaintiff "presented ample evidence to show a threatened loss of good will and customers, both present and potential, neither of which could be rectified by monetary damages").

In addition, "[p]roof of a likelihood of confusion establishes . . . irreparable harm." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1970). The Second Circuit has reached this conclusion for a number of reasons. First, "[i]t is difficult to calculate the profits a defendant obtained, and that would therefore be disgorged, due to its use of plaintiff's mark." *SMJ Group, Inc. v. 417 Lafayette Rest. LLC*, 439 F. Supp.2d 281, 293 (S.D.N.Y. 2006). Second, "confusion may cause consumers to reject both plaintiff's and defendant's products." *Id.* Finally, "calculating lost sales due to defendant's infringement is extremely difficult." *Id.*

These factors "are present in virtually every case," and this one is no exception. *Cf., id.* (describing ordinary case and then identifying a limited exception). Accordingly, by demonstrating the likelihood of confusion, further discussed below, Plaintiff proves that it will suffer irreparable harm unless an injunction is granted.

**C.    Tutor Time® Is Likely To Succeed On The Merits Of Its Claims And The Equities Tip Decidedly in Tutor Time®'s Favor**

**1.    *Tutor Time® Is Likely to Succeed on its Trademark Infringement Claims***

A claim for trademark infringement under Section 32 or Section 43 of the Lanham Act arises when (1) the plaintiff's mark is entitled to protection; and (2) the defendant's use of the mark is likely to cause confusion as to the origin or sponsorship of the defendant's goods. *Virgin Enters.*, 335 F.3d at 146.   Tutor Time® is likely to succeed on the merits on both of these inquiries, and a preliminary injunction should issue.

*(a)    Plaintiff's Mark Is Incontestable and Entitled to Protection*

The Tutor Time® Marks are registered on the Principal Register of the United States Patent and Trademark Office ("PTO").  *See* Cmplt., Ex. A  There is no colorable dispute that the Tutor Time® Marks are valid and legally protectable as evidenced by their registrations.   Thus, Tutor Time® satisfies the first prong of an infringement claim under Sections of 32(1) and 43(a) of the Lanham Act:  the Marks are valid and legally protectable.

*(b)    Defendant's Use of Plaintiff's Incontestable Marks Is Likely to Cause Consumer Confusion*

The evidence also demonstrates that Tutor Time® is likely to succeed in showing that the Staten Island and Queens Location Defendants' usage of the Tutor Time® Marks creates a likelihood of confusion – in fact, likelihood of confusion is inevitable when, as in this case, the identical Marks are being used concurrently by unrelated entities.   In the *Polaroid* case, Judge Friendly identified for the Second Circuit a list of six factors to consider when determining whether there is a likelihood of confusion.  *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492 (2d Cir. 1961).  These factors are:  (i) the strength of the plaintiff's mark; (ii) the similarity of the defendant's mark to the plaintiff's mark; (iii) the proximity of the products sold under defendant's

mark to those sold under plaintiff's; (iv) if the products (as opposed to the marks) are different, the likelihood that the plaintiff will "bridge the gap" by selling the products being sold by defendant; (v) the existence of actual confusion among consumers; (vi) the sophistication of consumers; (vii) the quality of the defendant's products; and (viii) defendant's good or bad faith. *Id.* at 495. These factors are non-exclusive, and the weight given to each factor may vary in a particular case. *Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 294 (S.D.N.Y. 2003). Moreover, when "the likelihood of confusion is in doubt, the question will be resolved in favor of the senior user." *Id.*

Here, the Staten Island Location Defendants are not, and never have been, authorized franchisees while the Queens Location Defendants have had their franchise agreements duly terminated due to their own material breaches. In both these locations, the defendants' unauthorized use of the Tutor Time® Marks creates confusion concerning the origin of the services and causes the consuming public to patronize a business that is not authorized or controlled by Tutor Time® and is not obligated to adhere to Tutor Time®'s standards, and yet appears to be affiliated with Tutor Time®. In fact, the Tutor Time® headquarters located in Michigan has received multiple complaints about the operation and management of the Staten Island Location Childcare Center despite the fact that the Staten Island Location Childcare Center is *not* a member of the Tutor Time® franchise. *See* Young Dec. at ¶¶ 24-26.

Thus, where, as here, the Marks in question have been registered for years, and are strong and distinctive marks (factor (i)); the Staten Island and Queens Location Defendants are using the exact marks themselves (factor (ii)) to offer precisely the same services to precisely the same market (factor (iii)); with the intent to trade on Plaintiff's goodwill (factor (iv)); and the existence of actual confusion among consumers is shown (factor (v)); there can be no doubt that

8

a likelihood of confusion has been established. Thus, application of the *Polaroid* factors favors
the entry of injunctive relief

### 2. *Tutor Time® Is Likely to Succeed on its Dilution Claims*

New York's anti-dilution statute was enacted in 1961. Since then, the New York Court of
Appeals has commented that, by passing the anti-dilution statute, the legislature sought to
remedy "a cancer-like growth of dissimilar products or services which feeds upon the business
reputation of an established distinctive trade-mark or name." *Allied Maintenance Corporation v.
Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 544, 399 N.Y.S.2d 628 (1977). Indeed, the
"harm that [the anti-dilution statute] is designed to prevent is the gradual whittling away of a
firm's distinctive trademark or name." *Id.*

Trademark dilution claims under the New York anti-dilution statute require two primary
elements: (1) the mark must be distinctive; and (2) dilution, whether by blurring or tarnishment
of the mark, must be likely. N.Y. Gen. Bus. Law § 360-l (McKinney 2006). Both of these
elements are met here.

#### (a) *Tutor Time®'s Marks Are Distinctive*

"[D]istinctiveness for dilution purposes often has been equated with strength of the mark
for infringement purposes." *Mead Data Central, Inc., v. Toyota Motor Sales, U.S.A., Inc.*, 875
F.2d 1026, 1030 (2d. Cir. 1989). The Southern District of New York has employed the same
analysis in the dilution context as is applied to trademark infringement claims under the Lanham
Act. *Kraft General Foods, Inc., v. Allied Old English, Inc.*, 831 F. Supp. 123, 134 (S.D.N.Y.
1993). As illustrated above, the Tutor Time® Marks are distinctive.

#### (b) *Defendant's Use Is Likely to Dilute Tutor Time®'s Marks*

Dilution is likely when the defendant's use either (i) blurs the mark's product
identification, or (ii) tarnishes the affirmative associations a mark has come to convey. *Kraft*

9

*General Foods, Inc., v. Allied Old English, Inc.*, 831 F. Supp. 123, 134 (S.D.N.Y. 1993). Tarnishment occurs when a trademark is "linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *New York Stock Exchange v. New York, New York Hotel, LLC*, 293 F.3d 550, 558 (2d Cir. 2002).

Here, the defendants' use of the Tutor Time® Marks and intellectual property at the Staten Island and Queens locations unquestionably tarnishes the affirmative associations of the Tutor Time® Marks.  For example, the Tutor Time headquarters in Michigan has received multiple complaints from customers who believe the Staten Island Location Childcare Center is associated with the Tutor Time® Brand. *See* Young Dec. at ¶¶ 27-28.  It is thus more than likely, that Tutor Time® customers and potential future customers are likely to link the shoddy childcare services being offered by the defendants with Tutor Time®.  Such damages to the reputation of Tutor Time® is irreparable, and dilute the Tutor Time® Marks.

### 3.    *Tutor Time® Is Likely to Succeed On Its Trademark Infringement and Unfair Competition Under New York Common Law Claims*

Because the Tutor Time® Marks are incontestable, and the defendants are engaging in unfair competition with Tutor Time® by using the Tutor Time® Marks in a manner calculated to deceive and confuse the public into believing that the Staten Island Location and the Queens Location childcare centers and their services are those of Tutor Time® or are licensed by, endorsed by, or otherwise associated with Tutor Time®, Tutor Time® is likely to succeed on its common law trademark infringement and unfair competition claims.

### D.    **The Equities Favor Tutor Time®**

When the plaintiff is likely to succeed on the merits of its claims, the Court need not consider whether the balance of the hardships tips in Plaintiff's favor. *Virgin Enters.*, 335 F.3d at

10

145.  As explained above, Tutor Time®, *is* likely to succeed on the merits of its claims.  Even if Tutor Time®, had not proven its likelihood of success, however, it still would be entitled to injunctive relief because the equities strongly favor Tutor Time®.

When balancing the equities, courts have considered (i) the quality of the defendant's product; (ii) the defendant's good or bad faith; and (iii) the defendant's good will in its own mark. *Lambda Elec. Corp. v. Lambda Tech., Inc.*, 515 F. Supp. 915, 928-29 (S.D.N.Y. 1981).  As explained above, all of these inquiries tip decidedly in Plaintiff's favor.

## II.    Violation Of Post-Term Competitive Restrictions

### A.     Preliminary Injunction Standard

As noted *supra,* in the Second Circuit an injunction "should be granted when the intervention of a court of equity is essential to protect a party's property rights against injuries that would otherwise be irremediable." *Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69–70 (2d Cir.1999) (internal citations omitted) (affirming granting of preliminary injunction). Accordingly, courts will focus on the showing of irreparable harm and the inadequacy of legal remedies.  *Id.*; *see also, Singas Famous Pizza Brands Corp. v. New York Adver. LLC*, 11-1038-CV, 2012 WL 899231, *46 (2d Cir. Mar. 19, 2012) (copy attached)  (affirming grant of preliminary injunction against a former franchisee and in favor of the franchisor on a ten-mile post-term covenant not to compete and noting "[g]enerally, when a party violates a [reasonable] non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm" for purposes of imposing a preliminary injunction.") (internal citations omitted).

11

Similarly, in the Sixth Circuit,[3] a court considering whether to issue a preliminary injunction will consider (i) whether the movant has shown a strong or substantial likelihood of success on the merits; (ii) whether the movant has demonstrated irreparable injury; (iii) whether the issuance of a preliminary injunction would cause substantial harm to others, and; (iv) whether the public interest is served by the issuance of an injunction. *See In re DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir. 1985) (noting four factors and affirming grant of preliminary injunction where three factors other than likelihood of success were all strongly in favor of issuing the injunction).

### B.   Tutor Time® Will Suffer Irreparable Injury If Defendants Are Not Enjoined And The Equities Favor Tutor Time®

Both the Second and Sixth Circuits have held that the loss of customer goodwill amounts to irreparable injury because the damages flowing from such losses are difficult to compute. *See, Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69–70 (2d Cir. 1999) (affirming granting of preliminary injunction and finding that there is irreparable harm where it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."); *Singas Famous Pizza Brands Corp,* 2012 WL 899231, at *46; *Certified Restoration* 511 F. 3d at 550; *Basicomputer Corp. v. Scott,* 973 F.2d 507, 512 (6th Cir.1992) (finding that employer established irreparable harm sufficient to support issuance of injunction where employer would suffer competitive injury and loss of customer goodwill from defendants' alleged breach of their covenants).

---

[3]    To the extent this Court determines that the Sixth Circuit's standards for issuing a preliminary injunction are applicable to this case, the relevant case law is provided herein.

These are the exact injuries that Tutor Time® suffers when defendants are allowed to breach the Queens Location Agreements' post-term competitive restrictions and, unless defendants are restrained by this Court, Tutor Time® will continue to be irreparably damaged with no adequate remedy at law. *See* Young Dec. at ¶¶ 18-19, 27-28.

Where, as here, the plaintiff is likely to succeed on the merits of its claims, the Court need not consider whether the balance of hardships tips in Plaintiff's favor. *See Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.*, 323 F.Supp.2d 525, 540 (S.D.N.Y. 2004) (noting that because injunctive relief is justified based on plaintiff's showing of irreparable harm and likelihood of success on the merits, a balancing of the hardships is not necessary); *Virgin Enters.*, 335 F.3d at 145. However, even if Tutor Time® did not prove its likelihood of success it would still be entitled to injunctive relief because the balance of the hardships tips decidedly in favor of Tutor Time®. Weighed against Tutor Time®'s actual loss of customers and the damage to the Tutor Time® Marks and franchise system, defendants merely lose the ability to serve a limited number of clients who are clearly covered by the post-term covenants against competition. The equities weigh in Plaintiff's favor and an injunction should issue.[4]

---

[4]    To the extent, this Court chooses to apply the Sixth Circuit's preliminary injunction standards it should be noted that (i) the enforcement of contractual duties is in the public interest (*Certified Restoration* 511 F. 3d at 551) and; (ii) the only third parties that might be adversely affected by the issuance of the injunction enforcing the terms of the Queens Location Agreements would be defendants' current childcare customers. However, they would still be able to obtain childcare services from the Tutor Time® childcare centers located within a ten mile radius of the Queens Location Childcare Center and/or from a new Tutor Time® franchisee who could take over the location. *See* Young Dec. at ¶ 32. Thus, these factors also weighs in Plaintiff's favor and an injunction should issue.

**C.     Tutor Time® Is Likely to Succeed On The Merits Of Its Claim**

Under Michigan [5] law, non-compete provisions are fully enforceable when they are reasonable with respect to duration, geographical area, and line of business.  MICH. COMP. LAWS § 445.774(a)(1); *see also, Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.* 511 F. 3d 535, 541 (6th Cir. 2007) (applying Michigan state law to determine whether covenant not to compete clause was reasonable and finding that prohibiting defendants from providing certain services for two years following the termination of the franchise was reasonable because it prevented the former franchisees from using their knowledge of the franchisor's system and the relationships they established as former franchisees to steal customers of the franchise).

In *Certified Restoration* the Sixth Circuit reversed the lower court's denial of a preliminary injunction where a former franchisor was violating a covenant not to compete and observed:

> The likely interference with customer relationships *resulting from the breach of a non-compete agreement* is the kind of injury for which monetary damages are difficult to calculate. The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute . . . Such injuries are precisely what Plaintiff will suffer if Defendants are allowed to continue to breach the franchise agreement's non-compete clause. Accordingly, we find that Plaintiff would likely suffer an irreparable injury without the issuance of the preliminary injunction.

*Id.* At 550 (emphasis added) (internal citations omitted).  Here too, the types of harm that Tutor Time® will continue to suffer if the defendants are allowed to continue breaching the reasonable

---

[5]     Section 12.4 of the Queens Location Agreements (Cmplt. Exs. D and E) states that except to the extent that disputes are governed by the Lanham Act or other Federal Law the Agreements are governed by the law of the state in which Tutor Time®'s principal business office is located.  Tutor Time®'s principal business office is located in Michigan and accordingly the substantive law of the State of Michigan as related to the validity of covenants not compete is provided herein.

and valid post-term competitive restrictions are those that cannot be adequately remedied with monetary damages.  As further outlined below, the Queens Location Agreements' post-term competitive restrictions are enforceable and Tutor Time® has a reasonable competitive interest in preventing defendants from using confidential information defendants acquired as Tutor Time® franchisees to gain a competitive advantage.  *See* Young Dec. at ¶¶ 30-34. Accordingly, this factor weighs in Tutor Time®'s favor and an injunction should issue.

### 1. *The Post-Term Competitive Restrictions Are Reasonable With Respect To Duration*

Michigan courts have upheld non-compete agreements covering time periods of up to five years as reasonable.  *See, In re Spradlin,* 284 B.R. 830,835 (E.D. Mich. 2002) (non-competition agreement which limited its geographic scope to two states, prohibited party from engaging in the office furniture business and extended for five years was reasonable and enforceable under Michigan law).  Here, the post-term competitive restrictions extend for merely two years after the termination of the Queens Location Agreements, a wholly reasonable time period.

### 2. *The Post-Term Competitive Restrictions Are Reasonable With Respect To Geographical Area*

Under Michigan law, in assessing the geographic scope of a non-compete provision the "guiding principle is that such geographic limitations must be tailored so that the scope of the agreement is no greater than reasonably necessary to protect the employer's legitimate business interests." *Certified Restoration* 511 F. 3d at 547.  Here, the post-term competitive restrictions limit the defendants from establishing a childcare center within a ten mile radius of the Queens Location Childcare Center.  The reasonableness of the geographic scope of these restrictions is highlighted by the fact that two other Tutor Time® childcare centers are located within a ten mile radius of the Queens Location.  *See* Young Dec. at ¶ 32.  It would be eminently unjust to

15

allow defendants to use the confidential information, customer base and goodwill that they acquired as Tutor Time® franchisees as a competitive advantage against other Tutor Time® franchisees.  The geographic scope of the Queens Location Agreements' post-term competitive restrictions is limited and serves the legitimate goal of preventing unfair competition with Tutor Time®'s current and future franchisees.  *See* Young Dec. at ¶ 30.

### 3. *The Post-Term Competitive Restrictions Are Reasonable With Respect To Line of Business*

The line of business encompassed in the post-term competitive restrictions is likewise reasonable, since it is limited to businesses that would be in direct competition with Tutor Time®.  *In re Spradlin,* 284 B.R. at 835.  That is, it acts solely to ensure that the former franchisees do not gain an unfair advantage in the childcare services business by utilizing information and techniques they accessed by virtue of their status as Tutor Time® franchisees. *See* Young Dec. at ¶¶ 13-14.

### CONCLUSION

Based upon the foregoing, Plaintiff respectfully requests that this Court enter an order granting Plaintiff's motion in its entirety.


Dated:  New York, New York
        August 31, 2012


                              BUCHANAN INGERSOLL & ROONEY PC

                              By: _____
                                 Stuart P. Slotnick
                                 1290 Avenue of the Americas, 30th Floor
                                 New York, NY  10104-3001
                                 Telephone: (212) 440-4400
                                 Facsimile:  (212) 440-4401
                                 Stuart.Slotnick@bipc.com
                                 *Attorneys for Plaintiff*

16

Westlaw.

468 Fed.Appx. 43, 2012 WL 899231 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 468 Fed.Appx. 43, 2012 WL 899231 (C.A.2 (N.Y.)))**

**H**
This case was not selected for publication in the
Federal Reporter.

United States Court of Appeals,
Second Circuit.
SINGAS FAMOUS PIZZA BRANDS CORP.,
Plaintiff–Appellee,
Singas Famous Pizza & Restaurant Corp.,
Plaintiff–Counter–Defendant–Appellee,
v.
NEW YORK ADVERTISING LLC, fka Ganesha
Oak, LLC, 11 Classic, Inc., Singas Express, Inc.,
Defendants–Appellants,
Kamini Vadhan, Defend-
ant–Counter–Claimant–Appellant.[FN*]

FN* The Clerk of the Court is directed to
amend the caption as noted.

No. 11–1038–cv.
March 19, 2012.

**Background:** Owner of chain of franchised pizza
restaurants brought trademark infringement action
against competitors, seeking to enjoin competitors
from operating former **franchise**. The United States
District Court for the Southern District of New
York, Holwell, J., 2011 WL 497978, granted **fran-
chise** owner's motion for a preliminary injunction
barring competitors from operating restaurants.
Competitors appealed.

**Holding:** The Court of Appeals held that ten-mile
geographic scope of **franchise** agreement's post-
termination non-compete clause was reasonable.
Affirmed.

West Headnotes

Contracts 95 ☞117(3)

95 Contracts
    95I Requisites and Validity

        95I(F) Legality of Object and of Considera-
tion
            95k115 Restraint of Trade or Competition
in Trade
                95k117 General or Partial Restraint
                    95k117(3) k. Extent of territory em-
braced in general. Most Cited Cases
    Ten-mile geographic scope of **franchise** agree-
ment's post-termination non-compete clause was
reasonably calculated towards furthering **franchise**
owner's legitimate interests in protecting its know-
ledge and reputation as well as its customer good
will; competitors expressly agreed in agreement
that ten-mile geographic restriction was "fair and
reasonable," that restriction was reasonable and ne-
cessary for protection of proprietary interest of
**franchise** owner, and that violation of restriction
would cause substantial and irreparable injury to
owner of chain of franchised pizza restaurants,
danger posed to **franchise** owner's institutional
know-how, reputation, and goodwill by competit-
ors' continued operation of former **franchise** res-
taurant was readily apparent, competing restaurant
used menu that was virtually identical to that used
at **franchises**, adopted certain distinctive practices
associated with **franchise** pizza restaurants, em-
ployed at least some of the same personnel as ter-
minated **franchise**, and used certain custom-made
equipment taken from terminated **franchise**.

*44 Appeal from the United States District Court
for the Southern District of New York (Holwell, J.).
**ON CONSIDERATION WHEREOF,** it is hereby
**ORDERED, ADJUDGED,** and **DECREED** that
the judgment of the district court be and hereby is
**AFFIRMED.**Michael Einbinder, Einbinder &
Dunn, LLP, New York, N.Y., for
Plaintiffs–Appellees.

Joseph P. Garland, White Plains, N.Y., for Defend-
ants–Appellants.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

468 Fed.Appx. 43, 2012 WL 899231 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 468 Fed.Appx. 43, 2012 WL 899231 (C.A.2 (N.Y.)))

Present: ROBERT A. KATZMANN and RICHARD C. WESLEY, Circuit Judges, MARK R. KRAVITZ, District Judge.FN**

FN** The Honorable Mark R. Kravitz, of the United States District Court for the District of Connecticut, sitting by designation.

## SUMMARY ORDER

**\*\*1** Plaintiffs–Appellees Singas Famous Pizza Brand Corp. and Singas Famous Pizza *45 & Restaurant Corp. (collectively, "Singas") operate or **franchise** nearly two dozen Singas Famous Pizza restaurants in the tri-state area. Singas brings this action seeking to enjoin Defendants–Appellants ("defendants") from operating a former Singas Famous Pizza **franchise** located at 94 Avenue C in New York, New York (the "Avenue C Restaurant") as well as a similar restaurant doing business as Queens New York Famous Pizza, located at 35–68 73rd St. in Queens, New York (the "Jackson Heights Restaurant"). By Memorandum Opinion and Order dated February 14, 2011, the United States District Court for the Southern District of New York (Holwell, *J.*) granted Singas's motion for a preliminary injunction barring defendants from operating both the Avenue C and the Jackson Heights Restaurants. Defendants appeal the district court's order only insofar as it applies to the Jackson Heights Restaurant, contending that the ten-mile geographic scope of a post-termination restrictive covenant in the parties' **Franchise** Agreement is unreasonably broad. We presume the parties' familiarity with the underlying facts and procedural history of this case.

"We review a district court's decision to grant or deny a preliminary injunction for abuse of discretion. An abuse of discretion occurs if the district court (1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be located within the range of permissible de-

cisions." *Oneida Nation of N.Y. v. Cuomo,* 645 F.3d 154, 164 (2d Cir.2011) (internal citation and quotation marks omitted). "Under abuse of discretion review, the factual findings and legal conclusions underlying the district court's decision are evaluated under the clearly erroneous and *de novo* standards, respectively." *Id.* (internal quotation marks omitted).

"In order to justify a preliminary injunction, a movant must demonstrate (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiffs favor; and (3) that the public's interest weighs in favor of granting an injunction." *Metro. Taxicab Bd. of Trade v. City of N.Y.,* 615 F.3d 152, 156 (2d Cir.2010) (internal citation and quotation marks omitted). "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d Cir.2009) (internal quotation marks omitted). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor,* 481 F.3d 60, 66 (2d Cir.2007) (internal quotation marks omitted).

**\*\*2** Under New York law, a restrictive covenant is "rigorously examined" and only enforced if it is "reasonable[ ] ... in terms of its time, space or scope" and not "oppressive[ ][in] its operation." *Am. Inst. Chem. Eng'rs v. Reber–Friel Co.,* 682 F.2d 382, 387 (2d Cir.1982) (internal quotation marks omitted); *see also, e.g., Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69 (2d Cir.1999) (finding in the employment contracting context that "[t]he issue of whether a restrictive **covenant not to compete** is enforceable by way of an injunction depends in the first place upon whether the covenant

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

468 Fed.Appx. 43, 2012 WL 899231 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 468 Fed.Appx. 43, 2012 WL 899231 (C.A.2 (N.Y.)))**

is reasonable in time and geographic area" weighing "the need to protect the employer's legitimate business interests against the employee's **\*46** concern regarding the possible loss of livelihood"); *Pantone, Inc. v. Esselte Letraset, Ltd.,* 878 F.2d 601, 608 n. 2 (2d Cir.1989) ("Under New York law, if there is a transfer of good will, an accompanying **covenant not to compete** is valid unless it is more restrictive than is reasonably necessary." (internal quotation marks omitted)). "Generally, when a party violates a [reasonable] non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm" for purposes of imposing a preliminary injunction. *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,* 323 F.Supp.2d 525, 532 (S.D.N.Y.2004) (citing cases); *see also Ticor Title,* 173 F.3d at 69 (It is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client."). However, this Court has rejected the proposition "that irreparable harm must inevitably be assumed in breach of covenant cases." *Baker's Aid, Inc. v. Hussmann Foodservice Co.,* 830 F.2d 13, 15 (2d Cir.1987). "Though courts often issue preliminary injunctions when it appears likely that the plaintiff will prevail in **covenant-not-to-compete** cases, this is not an automatic process, but instead depends upon the factual particulars in each case." *Id.*

Here, defendants' principal argument on appeal is that the ten-mile geographic scope of the **Franchise** Agreement's post-termination non-compete clause is unreasonably broad because "[p]izza restaurants are inherently local." Appellant's Br. 11. For substantially the same reasons expressed in the district court's well-reasoned Memorandum Opinion and Order, we disagree. *See Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC,* 10 Civ. 8976, 2011 WL 497978 (S.D.N.Y. Feb.10, 2011). As an initial matter, defendants expressly agreed in the **Franchise** Agreement that the ten-mile geographic restriction was "fair and reasonable," that the restriction was "reasonable and necessary for the protection of the proprietary interest of

[Singas]," and that "violation of [the restriction] would cause substantial and irreparable injury to [Singas]." J.A. 76–77. We have previously held that a defendant's agreement to such contractual provisions "might arguably be viewed as an admission ... that plaintiff will suffer irreparable harm were [defendant] to breach the contract's non-compete provision." *Ticor Title,* 173 F.3d at 69.

**\*\*3** More fundamentally, we conclude that, in the circumstances of this case, the non-complete clause's ten-mile geographic restriction is reasonable. There are nine Singas Famous Pizza restaurants within ten miles of the Avenue C Restaurant, several of which are clustered within a few miles of the Jackson Heights Restaurant. Moreover, the original Singas Famous Pizza restaurant—referred to by both parties in their briefs on appeal as Singas's "flagship" restaurant—is located less than a mile away from the Jackson Heights Restaurant. Further, defendants seek to characterize Singas's legitimate business interest in enforcing the restrictive covenant as limited to protecting its ability to install another **franchise** in the neighborhood surrounding the Avenue C Restaurant. However, courts applying New York law have recognized that restrictive covenants in **franchise** agreements are also necessary to neutralize the "danger that former franchisees will use the knowledge they have gained from the franchisor to serve its former customers, and that continued operation under a different name may confuse customers and thereby damage the good will of the franchisor." *ServiceMaster Residential/ Commercial Servs., L.P. v. Westchester Cleaning Servs., Inc.,* 01–CV–2229, 2001 WL 396520, at \*3 (S.D.N.Y. Apr.19, 2001). In the circumstances **\*47** presented here, the danger posed to Singas's institutional know-how, reputation, and goodwill by the defendants' continued operation of the Jackson Heights Restaurant is readily apparent. As the first paragraph of **Franchise** Agreement states, "[Singas] has developed a distinctive system for the operation of an Italian pizza [restaurant] ... and has developed good will and recognition with the public ... with regard to certain [items of intellectual

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

468 Fed.Appx. 43, 2012 WL 899231 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 468 Fed.Appx. 43, 2012 WL 899231 (C.A.2 (N.Y.)))**

property] including the tradename 'Singas.' " J.A. 58. Moreover, as conceded by defendants on appeal, the Jackson Heights Restaurant not only used a menu that was "virtually identical" to that used at Singas Famous Pizza **franchises**, but also adopted certain distinctive practices associated with Singas Famous Pizza restaurants, employed at least some of the same personnel as the terminated Avenue C Singas **Franchise**, and used certain custom-made equipment taken from the Avenue C Restaurant. *Singas Famous Pizza,* 2011 WL 497978, at \*4. This is precisely the situation non-compete provisions in **franchise** agreements are designed to protect against. Accordingly, in analogous cases, courts applying New York law have not hesitated in enforcing comparable geographic restrictions in a **franchise** agreement's post-termination non-compete provision. *See, e.g., Carvel Corp. v. Eisenberg,* 692 F.Supp. 182, 186 (S.D.N.Y.1988) (upholding provision "limiting the [former franchisee's] ability to operate an ice cream store within two miles of their present location for three years"); *Carvel Corp. v. Rait,* 117 A.D.2d 485, 487, 503 N.Y.S.2d 406 (N.Y.App. Div. 2d Dep't 1986) (same); *DAR & Assocs., Inc. v. Uniforce Servs., Inc.,* 37 F.Supp.2d 192, 199 (E.D.N.Y.1999) (upholding provision restricting former licensee, a professional staffing business, from competing within fifty miles of former place of business for one year); *TKO Fleet Enters., Inc. v. Elite Limousine Plus, Inc.,* 184 Misc.2d 460, 708 N.Y.S.2d 593, 596 (N.Y.Sup.Ct.2000) (upholding provision restricting former limousine franchisee from competing within fifty miles of Times Square for one year); *cf. Maxon v. Franklin Traffic Serv., Inc.,* 261 A.D.2d 830, 832, 689 N.Y.S.2d 559 (N.Y.App. Div. 4th Dep't 1999) (striking down as unreasonable a provision restricting former franchisee, a shipping company, from competing within 300 miles for five years).

**\*4** Accordingly, we conclude that the ten mile geographic restriction in the **Franchise** Agreement is reasonably calculated towards furthering Singas's legitimate interests in protecting its "knowledge and reputation" as well as its "customer good will."

*See Johnson,* 323 F.Supp.2d at 532, 536. Moreover, for the reasons described, we conclude that the district court correctly determined that, in the circumstances of this case, Singas would suffer irreparable harm if defendants were allowed to continue operating the Jackson Heights Restaurant as an Italian pizza restaurant, in violation of the **Franchise** Agreement's restrictive covenant.

We have considered defendants' other arguments on appeal and find them to be without merit. Accordingly, the judgment of the district court is hereby **AFFIRMED.**

C.A.2 (N.Y.),2012.
Singas Famous Pizza Brands Corp. v. New York Advertising LLC
468 Fed.Appx. 43, 2012 WL 899231 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.